**DISTRICT OF COLUMBIA, Appellant,**

v.

**WASHINGTON SHERATON CORPORATION, Appellee.**

No. 83–1045.

District of Columbia Court of Appeals.
Argued Nov. 19, 1984.
Decided Oct. 4, 1985.

if we reinstated the original compensation award. Accordingly, we express no opinion on the issue of permanence.

Lutz Alexander Prager, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C. were on briefs, for appellant.

John R. Risher, Jr., Washington, D.C., for appellee.

Before FERREN, BELSON and TERRY, Associate Judges.

BELSON, Associate Judge:

The Washington Sheraton Corporation brought an action in the Tax Division of the Superior Court that resulted in a substantial reduction of the tax assessment of its hotel property for the 1982 tax year. The District of Columbia appeals the Superior Court's evaluation for that year, and its further ruling that the same assessment should be in force for the 1983 tax year. We agree with the District that the trial court erred in the manner in which it applied the income capitalization method of valuation. Accordingly, we reverse and remand for further proceedings.

I

The dispute here is over the value of improvements rather than land. The Washington Sheraton complex consists of three buildings: the Wardman Towers, completed in 1930, with 308 rooms; the Motor Inn, completed in 1962, with 215 rooms, and the new Main Building, completed in March 1980, with 990 rooms. Extensive renovations of the Wardman Towers and the Motor Inn were completed in September 1982.

The new Main Building, erected between 1978 and 1980 next to the original building, incorporated parts of the original building. The greatest part of the original building

was demolished after the new structure was completed. During and after the period of construction of the new Main Building, the hotel also renovated the Wardman Towers and the Motor Inn. Only a portion of each—from 4 rooms to 2 floors—was under repair at any one time. Thus, the hotel remained open during the entire reconstruction period.

An assessor of real estate for the District of Columbia valued the improvements and land of the Washington Sheraton for the 1982 tax year at $78.6 million and $17.6 million, respectively, for a total $96.2 million.[1] The assessor used the construction cost method to value the improvements because he considered the hotel to be a new facility.

Washington Sheraton appealed the assessor's valuation to the Board of Equalization and Review. *See* D.C. Code § 47–825 (1981). The Board affirmed the assessor's valuation of the land, but lowered the valuation of the improvements from $78.6 million to $62.8 million, for a total including land of $80.3 million. Washington Sheraton paid the assessed tax, as calculated on the Board's valuation, and appealed to the Tax Division of the Superior Court. *See* D.C. Code § 47–3303 (1985 Supp.).

At a trial before the Tax Division, both parties presented expert testimony. The District's expert witness, William Harps, proposed a new value of $68.3 million for the improvements, and $13.4 million for the land, for a total of $81.7 million. Harps utilized an income capitalization analysis to derive the value of the improvements. The District also presented an official of the Department of Finance and Revenue who testified that its application of the replacement cost method produced a valuation of $96.2 million.

Washington Sheraton's expert, Anthony Reynolds, like the District's expert, Harps,

employed an income capitalization analysis, but arrived at a total valuation of $48.2 million: $37.7 million for the improvements and $10.5 million for land.[2]

The trial court, which has the power to affirm, cancel, reduce, or increase the assessment, D.C. Code § 47–3303 (1985 Supp.), evaluated the land at $13.4 million and the improvements at $48.2 million, for a total of $61.6 million.

The trial court also concluded that the valuation of the hotel for the year 1982 would be the basis for future assessments until the District performed a lawful reassessment. The court later found that the value of the entire hotel was $61.6 million for both tax year 1982 and tax year 1983.

The District appeals from the trial court's valuation of the improvements of the hotel at $48.2 million; there is no issue on appeal concerning the land value. The District also seeks relief from the order maintaining the same valuation for tax year 1983.

## II

This court reviews a decision of the Tax Division in the same manner as other civil cases tried without a jury. D.C. Code § 47–3304(a) (1981). We must accept the judge's findings of fact unless they are clearly erroneous, and we will not set aside a conclusion of law unless it is plainly wrong or without evidence to support it. D.C. Code § 47–3304; 17–305 (1981); *Rock Creek Plaza-Woodner Ltd. v. District of Columbia,* 466 A.2d 857, 859 (D.C.1983). We may affirm, modify, or reverse the decision of the trial court with or without remanding the case for hearing. D.C. Code § 47–3304 (1981).

The Tax Division has the power to evaluate *de novo,* D.C. Code § 47–3303

1. The 1982 tax year ran from July 1, 1981 to June 30, 1982. The assessor determined the estimated market value of the property as of January 1, 1981, as required by statute. *See* D.C.Code § 47–820(a) (1981).

2. In his testimony, as distinguished from his report, Reynolds designated a slightly lower value—$46.1 million total ($35.6 million improvements; $10.5 million land) than that proposed in his appraisal report.

(1981), *Rock Creek Plaza-Woodner,* 466 A.2d at 859 n. 1, and is "free to make its own independent evaluation of the evidence." *Id.* at 859. The court may adopt the rationale of one testifying expert over the other, or even disregard the conclusions of both. *Id.* The court may not, however, arbitrarily reject such expert testimony. *Id.*

We conclude that the court's valuation of the hotel's improvements here was clearly erroneous and reverse its decision. The court's apparent misunderstanding of the testimony of Sheraton's expert witness resulted in an error of mathematical calculation that substantially skewed the valuation. We are confident that the trial court, when it reconsiders that testimony, will do more than simply correct the mathematical error and change the valuation accordingly. On remand, the court will have the opportunity to compare the valuations the experts derived by the income capitalization approach with other evidence of value. The court will also be in a position to reconsider the methodology of the experts in light of our observations concerning controlling statutes and regulations. On remand, the court in its discretion may conduct such further proceedings as it deems appropriate.

### III

We turn first to an explanation of why we deem clearly erroneous the court's decision to value improvement at $48.2 million and the entire property at $61.6 million. The court stated in its written opinion that it evaluated the land at $13.4 million because that figure was derived by Harps' better methodology. On the other hand, the court rejected Harps' valuation of improvements, and expressly stated that "the Court is persuaded that the method [of valuation of improvements] chosen by Mr. Reynolds is more accurate." The court then, however, listed the value of the improvements at $48.2 million when, in fact, Reynolds had concluded that $48.2 million represented the value of improvements

plus land. Reynolds estimated the value of the improvements alone at $37.7 million. Given that the court stated that it was relying on Reynolds' calculation of the value of the improvements alone, the court clearly erred by then using Reynolds' value for both improvements and land. In short, the court counted the value of land twice. For the court's guidance on remand, we discuss some of the controlling principles to be applied by the trial court.

### IV

The assessed value of property for real property taxation purposes shall be the "estimated market value" of the property on January 1st of the year preceding the tax year. D.C. Code § 47–820(a) (1981). The Code defines the term "estimated market value" as:

> 100 per centum of the most probable price at which a particular piece of real property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would be expected to transfer under prevailing market conditions between parties who have knowledge of the uses to which the property may be put, both seeking to maximize their gains and neither being in a position to take advantage of the exigencies of the other.

*Id.* § 47–802(4). In determining the estimated market value, the assessment shall take into consideration:

> [A]ll available information which may have a bearing on the market value of the real property including but not limited to government imposed restrictions, sales information for similar types of real property, mortgage or other financial considerations, replacement costs less accrued depreciation because of age and condition, income earning potential (if any), zoning, the highest and best use to which the property can be put, and the present use and condition of the property and its location.

Regulation No. 74–35, § 108(a), 21 D.C. Reg. 1643 (Jan. 20, 1975) (codified at 16

DCRR § 108(a); 9 DCMR § 307.1).[3] The appraiser may apply one or more of the three generally recognized approaches of valuation when considering the above factors. 16 DCRR § 108(b); 9 DCMR § 307.2. Those three approaches are the replacement cost, comparable sales, and income methods of valuation. 16 DCRR § 108(b), 9 DCMR § 307.3–.5. Usually the appraiser considers the use of all three approaches, but one method may be most appropriate depending on the individual circumstances of the subject property. Rushmore & Rubin, *The Valuation of Hotels and Motels for Assessment Purposes*, APPRAISAL JOURNAL, Apr. 1984, at 270, 272–73;[4] *accord California Portland Cement Co. v. State Board of Equalization*, 67 Cal.2d 578, 432 P.2d 700, 704, 63 Cal.Rptr. 5, 9 (1967).

The replacement cost approach employs the "cost of replacing property with new property of similar utility at present price levels, less the extent to which the value has been reduced by depreciation because of age, condition, obsolescence, or other factors." 16 DCRR § 108(b)(2); 9 DCMR § 307.4. The replacement cost may "be estimated either by (1) adjusting the property's original cost for price level changes, or (2) applying current prices to the property's labor and materials components and taking into account any other costs typically incurred in bringing the property to a finished state." *Id.*

■ The trial court did not err in rejecting replacement cost as a reliable method of valuing the hotel. The court noted that the hotel was not new, observing that its business continued uninterrupted during the period of reconstruction. *See* Rushmore & Rubin, *supra*, at 273 (replacement cost approach may be appropriate for newly constructed facilities); *accord Driftwood Shores, Inc. v. Department of Revenue*, 276 Or. 619, 555 P.2d 1251 (1976) (cost approach used to value motel in operation less than 6 months).[5]

An appraiser also may employ the comparable sales approach to value property. Recent sales of similar property are compared, and the price must be adjusted to reflect dissimilarities with the subject property. Rushmore & Rubin, *supra*, at 273–74. Such an approach is less reliable for complex properties such as hotels, where it is difficult to adjust for numerous differences. As with the cost approach, this method does not usually reflect the value that an investor in hotels would divine in his analysis of whether to purchase the property, and thus is given very little weight in hotel appraisal. *Id.* Although both experts utilized the comparable sales approach for the evaluation of the hotel's land, not an issue here, they rejected its use here to evaluate improvements.

The third method, the income capitalization approach, is the most favored method of valuation of hotels, because it is most similar to the analysis made by knowledgeable buyers before they purchase a hotel. S. RUSHMORE, THE VALUATION OF HOTELS AND MOTELS 58 (1978). That approach

entails deriving a "stabilized annual net income" by reference to the income and expenses of the property over a period of

3. Regulation No. 74–35 was originally codified at 16 DCRR, but was recodified at 9 DCMR, chapter 3. Citations herein shall be to 16 DCRR, followed by the current cite in 9 DCMR.

4. Both parties' experts recognized Rushmore as a leading authority in the field of valuation of hotels.

5. It has been recognized that the replacement cost approach may seriously overvalue a property, so that its principal function is to set a ceiling on valuation. *G.R.F., Inc. v. Board of Assessors of County of Nassau*, 41 N.Y.2d 512, 514, 362 N.E.2d 597, 598, 393 N.Y.S.2d 965, 967 (1977); *accord Shawmut Inn v. Town of Kennebunkport*, 428 A.2d 384, 391 (Me.1981) (replacement cost approach may render highest value of three standard approaches). Additionally, the replacement cost approach does not reflect income-related factors that would influence a purchaser. Rushmore & Rubin, *supra*, at 273. Therefore, the replacement cost approach is "usually given very little weight in the hotel valuation process." *Id.*

several years. That annual net income is then divided by a capitalization rate—a number representing the percentage rate that taxpayers must recover annually to pay the mortgage, to obtain a fair return on taxpayers' equity in the property, and to pay real estate taxes.

*Rock Creek Plaza-Woodner,* 466 A.2d at 858; *accord* 16 DCRR § 108(b)(3); 9 DCMR § 307.5.[6]

Both experts utilized the income capitalization approach; yet their valuations of the hotel's improvements differed by $32.6 million. That wide disparity resulted principally from their contrasting approaches to the estimation of stabilized net income.

Reynolds derived a figure for the stabilized net income as of January 1, 1981, by referring to the hotel's actual income for the last 6 calendar months of 1980 and the first 6 calendar months of 1981. He did not use solely the actual income for 1980 because he deemed it an atypical year due to the reduced scale of operation of the hotel during construction of the new Main Building in early 1980. After deducting the income generated by non-realty items, he applied a capitalization rate of 14.38%.[7]

Harps developed a stabilized net income by a different route. He too considered the hotel's income in 1980 to be atypical. In his opinion, the hotel would not obtain a stabilized rate of occupancy and income until 1983. Harps referred to trends in the District and the nation to predict the revenue and expenses for the calendar years 1981, 1982, and 1983. He used as a stabilized net income the net income projected for 1983. He capitalized that 1983 figure, at 14.63%, to arrive at the market value of the hotel as of January 1, 1983. Then he

deducted the value of personal property, and discounted the resulting figure to reach the value of the hotel as of January 1, 1981.

The court concluded that Reynolds' analysis, based on actual earnings 6 months before and after January 1, 1981, provided a more accurate stabilized income than Harps' discounted projection of earnings 3 years in the future. The court also felt that Reynolds' approach was more consistent with that regularly used by the District's assessors—that of using the actual net income for the prior year as the stabilized net income.

On remand, the court should re-evaluate the methodologies employed by the experts. In particular, several statements by Reynolds raise the question whether his analysis was marred by an inaccurate interpretation of the definition of estimated market value.

Reynolds prefaced his report by defining estimated market value "as derived from current, not future benefits." Although he found the total value of the hotel to be $46.1 million for taxation purposes, he stated that its investment value was $73 million:

> The seventy-three million dollars is the worth of the investment. It is the value for investment purposes.... generally, you don't get that every day and you don't get that every year. You get that in the future. That's the future. And when it's worth seventy-three million, I'm sure the assessment will be seventy-three million. That's an investment number. It happens not to be appropriate, as the income shows, for the particular year in question.

---

**6.** The regulations concerning this approach provide:

> *The income approach to value.* The amount that investors would be willing to pay to receive the income that the property could be expected to yield.
>
> An indication of the value of an income producing property may be estimated by computing the present worth of a future income stream.
>
> The income stream is capitalized or converted into an indicated value. The amount to be capitalized may be either the gross or net return.
>
> 16 DCRR § 108(b)(3).

**7.** There is no issue concerning the rate of capitalization. In fact, Reynolds used a lower rate than did Harps. The use of a lower rate increases valuation.

This is if you went out three years, or went out in the future, you would find numbers like that.

When asked how the investment price compared with market value, Reynolds explained that the assessor should focus upon the "income available to the property as of the assessment." Thus, Reynolds considered there to be a difference between the "long-term investment value" and the real estate tax market value. He noted that "the very important aspect of 'under prevailing market conditions.' ... distinguishes the market value for assessment purposes with the market value for long term investment purposes." The trial court agreed with that analysis.

That viewpoint appears to misconceive the applicable statutory and regulatory definition of estimated market value. It is a "cardinal rule" that "whatever property is worth for the purposes of income and sale it is also worth for purposes of taxation." *Adams Express Co. v. Kentucky*, 166 U.S. 185, 220, 17 S.Ct. 604, 605, 41 L.Ed. 965 (1897). Estimated market value is not determined, as Reynolds suggested, by reference to "income available to the property as of the assessment" but by reference to "income earning potential." 16 DCRR § 108(b); 9 DCMR § 307.1. The fundamental notion that the market value of income-producing property reflects the "present worth of a future income stream" is at the heart of the income capitalization approach. 16 DCRR § 108(b)(3); 9 DCMR § 307.5; *accord California Portland Cement Co.*, 67 Cal.2d at 582, 432 P.2d at 704, 63 Cal.Rptr. at 9.

When an income-producing property has been in operation for a period of time, its past earnings assist the assessor in projecting future earning ability. *Id.*, 67 Cal.2d at 582, 432 P.2d at 704, 63 Cal.Rptr. at 9. Profit data for the past several years may indicate a trend and "help avoid error which could be cause from examining a short, possibly abnormal period." *Id.; accord Rock Creek Plaza-Woodner*, 466 A.2d

at 858 (stabilized annual net income derived by reference to profits of the property over period of several years).

In some circumstances, though, a short hand approach permits the assessor to utilize as the stabilized net income the existing hotel's "actual operating revenues and expenses for either the year prior to or subsequent to the date of value." Rushmore & Rubin, *supra*, at 277. The rationale is that "most hotels older than eight years are in the plateau or declining stages of their life cycle, and the historic net income does not significantly understate what can be considered a stabilized level." *Id.* The record indicates that this short hand approach has frequently been used in the District.

If the level of operation in the target year is abnormal, or if the hotel is relatively new, however, using only the actual income of one year would not reflect accurately the hotel's future earning potential. *See Willow, Inc. v. Yankton County*, 89 S.D. 643, 649, 237 N.W.2d 660, 664 (1975) (income in particular year may reflect temporary boom or depression).

Since both experts agreed that 1980 was a year of reduced operations for the hotel, using only actual 1980 income as the stabilized figure would underestimate the market value.[8] Thus, because the reconstruction disrupted the usual operation of the hotel, an approach to income capitalization somewhat at variance with the usual practice for hotels in the District is justified. *See Hammermill Paper Co. v. City of Erie*, 372 Pa. 85, 98, 92 A.2d 422, 429 (1952) (no lack of uniformity in valuation when different methods used, if there is just basis for difference), *cert. denied*, 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1367 (1953).

It will become the trial court's task on remand to determine how to calculate stabilized net income under the circumstances that obtained. In performing that task, the court will be obliged to apply the statutory concept that present estimated market val-

---

**8.** The net income of the hotel increased from $7.2 million in 1980 to $13.0 million in 1981.

ue includes an estimate of future income potential.

 Furthermore, on remand, the court should compare the results achieved by the income capitalization approach with other factors. *See* 16 DCRR § 108(a); 9 DCMR § 307.1 (assessor shall take into account all available information). In addition to those factors discussed earlier, the court may consider the mortgage of $69 million on the hotel, *see Rock Creek Plaza-Woodner*, 466 A.2d at 860–61, the book value in 1980 of $68.0 million, and the transfer of the hotel in 1979 to a joint venture, which valued the improvements at $71.4 million.

Some courts consider the price of a previous arm's-length sale of the subject property to be evidence of the highest rank of the value of that property at the time of sale. *F.W. Woolworth Co. v. Tax Commission of New York*, 20 N.Y.2d 561, 565, 232 N.E.2d 638, 640, 285 N.Y.S.2d 604, 607 (1967); *cf. Shawmut Inn*, 428 A.2d at 394–95 (recent public sale of property is evidence of market value; weight depends on showing price reflects arm's-length transaction); *see generally* 89 ALR 3d 1126 (1979). The mortgage and sale here must be adjusted before they provide guidance because they contain elements of non-realty and reflect non-current interest rates. Furthermore, if the joint venture transaction does not represent an arm's-length sale, its probative value may be reduced drastically.

Because we reverse the court's 1982 valuation, we also reverse the court's valuation of the hotel for tax year 1983 at the same figure as tax year 1982. The court may, in its discretion, consider further evidence concerning whether the Board lawfully reassessed the hotel in 1983, and whether the value of the property had increased. *See District of Columbia v. Burlington Apartment House Co.*, 375 A.2d 1052 (D.C.1977) (en banc).[9]

This case, therefore, is remanded to the trial court for such further proceedings as the court in its discretion deems appropriate, and for findings of fact and conclusions of law.

*Reversed and remanded.*

---

9. Washington Sheraton argues that the District waived its right to seek relief from the assessment for tax year 1983 by submitting a form of order directing that the evaluation remain the same for tax year 1983 as it was for tax year 1982. That argument falls with our ruling regarding tax year 1982.