William B. WOLF, Sr., et al., Appellants,

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 91–TX–166.**

District of Columbia Court of Appeals.

Argued May 12, 1992.
Decided June 5, 1992.

M. Paul Zimmerman, Washington, D.C., for appellants.

Edward E. Schwab, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and SCHWELB, Associate Judges.

ROGERS, Chief Judge:

Appellants William B. Wolf, Sr., William B. Wolf, Jr., and Charles Goldsmith appeal from the judgment reducing the assessed values of their commercial real property from $6,980,000 to $6,285,000 for tax year 1986 and from $7,659,906 to $7,494,000 for tax year 1987.[1] Maintaining that greater reductions were required, appellants contend that the trial judge erred by accepting the appraisal of the court-appointed expert because (1) in using the income approach for estimating the value of the property, the appraiser incorrectly used actual net income figures for the year following the relevant tax appraisal dates as the stabilized annual net income, and (2) in relying on the appraiser's use of the comparable sales approach to determine land value, the judge failed to make findings of fact on the sales used by the appraiser in concluding that the District government assessor's determinations of the property's land values for 1986 and 1987 were not unreasonable. They also contend that the judge erred by accepting appellee's assessment for tax year 1987 in an amount 37.5 percent higher than the 1986 assessment. We affirm.

I

The facts are undisputed. As general partners of ICONN Associates, appellants own commercial real property located on the southwest corner of Connecticut Avenue and Eye Street, N.W., in the District of Columbia.[2] The irregularly shaped land is improved by a 12–story commercial office building that was built in 1961. The building's total available rental space for commercial and retail purposes is 65,149 square feet.

The District of Columbia government originally assessed the value of the property for tax year 1986 at $6,980,000, allocating $3,257,280 to land and $3,722,720 to improvements, and for tax year 1987 at $8,656,000, allocating $4,478,760 to land and $4,177,240 to improvements. When appellants challenged the assessments, the Board of Equalization and Review declined to revise the 1986 assessment but reduced the 1987 assessment from $8,656,000 to $7,659,906, allocating $4,478,760 to the land and $3,181,146 to improvements. Dissatisfied with both outcomes, appellants appealed the assessments, seeking reductions for each tax year.[3] *See* D.C.Code §§ 47–825(i), –3303 (1987 Repl.).

At the trial, the witnesses on value for appellants and the District of Columbia gave widely divergent appraisals of the property's market value.[4] Concerned with

---

1. Appellants also appeal from the order of February 26, 1991, ordering refunds of taxes paid, based on the reduced assessments, of $14,108.50 in tax year 1986 and $3,367.89 in tax year 1987.

2. The property, otherwise known as Lot 813 in Square 165, uses two addresses: 824 Connecticut Avenue, N.W., and 1634 Eye Street, N.W.

3. The cases for the two tax years were consolidated at trial.

4. Appellant William Wolf, Jr., an attorney who had ownership interests in a number of other office buildings as well, but who was neither an appraiser or assessor, and appellants' only witness, testified that the assessed value of the property should be $4,800,000 for tax years 1986 and 1987, based, briefly stated, on his formula-

the possibility that both witnesses were not objective,[5] the trial judge appointed an expert appraiser, William S. Harps.[6] The judge found Mr. Harps to be qualified as an expert appraiser for purposes of determining the fair market value of the property.

Thereafter, Mr. Harps appraised the property at $6,285,000 for tax year 1986, allocating $3,257,280 to the land $3,027,720 to improvements, and at $7,494,000 for tax year 1987, allocating $4,478,760 to the land and $3,015,240 to improvements. To determine the property's market value for each year, Mr. Harps used an income approach to valuation. Under this method, he divided the actual net income of $846,038 for 1985 by a capitalization rate of .13465 to arrive at the $6,285,000 figure for 1986, and divided the actual net income of $1,048,450 for 1986 by a capitalization rate of .1399 to arrive at the $7,494,000 figure for 1987. Using a comparable sales method, Mr. Harps concluded that the District government assessor's land value determinations of $3,257,280 for tax year 1986 and $4,478,760 for tax year 1987 were "not unreasonable," and he adopted these figures as the estimated market values for tax years 1986 and 1987, respectively.[7]

The trial judge credited Mr. Harps' testimony, methodology, and appraisal of the property, and reduced the assessed value from $6,980,000 to $6,285,000 for tax year 1986 and from $7,659,906 to $7,494,000 for tax year 1987. The judge then ordered the District to refund the amount of the overpaid taxes to appellants. *See* note 1, *supra.*

II

Appellants contend that the trial judge erred by accepting Mr. Harps' appraisal of appellant's property for tax years 1986 and 1987 because, in applying the income approach to valuation, Mr. Harps used actual net income for the year following the valuation date as the stabilized annual net income to be capitalized. They argue that this approach was inappropriate because the District government's assessor would not have had access to such net income figures during his original assessment of the property's value and a hypothetical purchaser would not have had access to such figures on the valuation date.[8]

tion of a debt coverage formula and using raw reported gross income data (minus vacancy allowances) and operating expenses without adjustment. The trial judge found that Mr. Wolf's testimony focused on his view that only a sales price of $4,800,000 on the valuation dates would enable a buyer to "receive [a] 14% to 15% return on his cost requirement investment at purchase."

For the District government, Robert L. Klugel, Chief of the Standards and Review Division of the Department of Finance and Revenue, opined, based on both the income approach and the comparable sales approach to valuation, that the assessed value of the property was $7,895,000 for tax year 1986 and $8,900,000 for tax year 1987. The trial judge found that Mr. Klugel examined the property's income and expense history for six years. The District subsequently abandoned these valuations when it urged the trial judge to accept the independent assessor Harps' appraisals of value.

5. The trial judge found that Mr. Wolf testified that he "desired to pay the least amount of tax possible" while Mr. Klugel's "announced desire was to recover the maximum amount of the tax possible."

6. The judge requested the parties to submit three names of appraisers. Appellants declined to do so, urging instead that the judge make his own determination based on the testimony already presented. The District government submitted three names from which the judge selected William S. Harps.

7. Although Mr. Harps did not provide comparable sales figures in his written appraisal or quote any in open court, he stated during cross-examination that he had analyzed recent sales and that the District government assessor's figures were "in the ballpark." While appellants' trial counsel questioned Mr. Harps on the fact that the two land values implied a 37.5% increase between January 1, 1985 (statutory value date for tax year 1986) and January 1, 1986 (statutory value date for tax year 1987), he chose not to question Mr. Harps on the comparable sales data that he relied on when he told appellant's trial counsel that he would "start reciting the [comparable] sales ... at any moment [appellant's trial counsel] ask[ed] for them."

8. This contention led appellants similarly to claim that it was error for the trial judge not to correct Mr. Harps' appraisal by using either (1) the actual net income figures prior to the statutory valuation date, (2) appellants' estimated market values, or (3) the "District's most legally

The trial court's factual findings are binding upon this court unless they are clearly erroneous, and the court will not disturb the judgment unless it is plainly wrong or without evidence to support it. *George Washington Univ. v. District of Columbia*, 563 A.2d 759, 761 (D.C.1989) (quoting *Rock Creek Plaza–Woodner Ltd. Partnership v. District of Columbia*, 466 A.2d 857, 859 (D.C.1983)); *see also* D.C.Code § 17–305(a) (1989). The trial judge evaluates the factual issues *de novo*, pursuant to D.C.Code § 47–3303, and, although the judge may not "arbitrarily reject" expert testimony, the judge "may adopt the rationale of one testifying expert over the other, or even disregard the conclusions of both." *District of Columbia v. Washington Sheraton Corp.*, 499 A.2d 109, 112 (D.C.1985). We find no error by the trial judge in accepting Mr. Harps' appraisals of the property.

For taxation purposes, the assessed value of real property is "the 'estimated market value' of the property on January 1st of the year preceding the tax year." [9] *Id.* (citing D.C.Code § 47–820(a) (1981)).[10] Thus, in appraising appellants' property, Mr. Harps had to determine its market value as of January 1, 1985, for tax year 1986 and its market value as of January 1, 1986, for tax year 1987.

The three generally accepted approaches for determining market value are the replacement cost approach, the comparable sales approach, and the income approach. *Id.* at 113; 9 DCMR § 307.3–.5. While an appraiser must consider all three of these approaches, the appraiser may, in the exercise of discretion, ultimately rely on one method in determining a property's market value. *Safeway Stores, Inc. v. District of Columbia*, 525 A.2d 207, 209 (D.C. 1987) (citing 9 DCMR § 307.2); *District of Columbia v. Washington Sheraton Corp.*, *supra*, 499 A.2d at 113. In the instant case, Mr. Harps considered all three approaches, and he decided to base his valuation of the property on the income approach, which:

> entails deriving a "stabilized annual net income" by reference to the income and expenses of the property over a period of several years. That annual net income is then divided by a capitalization rate—a number representing the percentage rate that taxpayers must recover annually to pay the mortgage, to obtain a fair return on taxpayers' equity in the property, and to pay real estate taxes.

*Rock Creek Plaza–Woodner Ltd. v. District of Columbia*, *supra*, 466 A.2d at 858; *see also* 9 DCMR § 307.5. In Mr. Harps' opinion and, according to him, in "the opinion of practically all of the authors who have written in textbooks which are considered the basis of knowledge in the ap-

---

sufficient assessment (for tax year 1985)." Thus, appellants maintain that had Mr. Harps used actual net income for 1983 and 1984, respectively, in determining the estimated market value of the property in tax years 1986 and 1987, respectively, then, following his valuation formula, the property's market value would have been $5,256,888 in 1986 and $5,280,272 in 1987.

9. D.C.Code § 47–802(4) (1990), defines "estimated market value" as:

100 per centum of the most probable price at which a particular piece of real property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would be expected to transfer under prevailing market conditions between parties who have knowledge of the uses to which the property may be put, both seeking to maximize their gains and neither being in a position to take advantage of the exigencies of the other.

10. In estimating market value, 9 DCMR § 307.1 (1986) requires an appraiser to consider:

all available information which may have a bearing on the market value of the real property including but not limited to the following:
(a) government imposed restrictions;
(b) sales information for similar types of real property;
(c) mortgage or other financial considerations;
(d) replacement costs less accrued depreciation because of age and condition and other factors;
(e) income earning potential (if any);
(f) zoning;
(g) the highest and best use to which the property can be put; and
(h) the present use and condition of the property and its location.

praisal profession ... the [i]ncome [a]pproach to value is the prime and most necessary [sic] approach to value for investment properties, including office buildings, ... etc." [11]

■ A "stabilized annual net income" figure must reflect an appraiser's estimation of a property's yearly "income earning potential" because the income approach is based on the "fundamental notion that the market value of income-producing property reflects the present worth of a future income stream." *District of Columbia v. Washington Sheraton Corp., supra,* 499 A.2d at 115 (citation and internal quotation omitted); *see Wolf v. District of Columbia,* 597 A.2d 1303, 1309 (D.C.1991). Thus, a property's "income earning potential" should not be misinterpreted as the "income available to the property as of the assessment [date]." *District of Columbia v. Washington Sheraton Corp., supra,* 499 A.2d at 115; *see* 9 DCMR § 307.5(a) ("value of an income producing property may be estimated by computing the present worth of a future income stream").

Mr. Harps derived his "stabilized annual net income" figures by calculating the property's actual net income for the year following the statutorily defined assessment dates. In other words, he used actual net income for the year following January 1, 1985, for tax year 1986 and actual net income for the year following January 1, 1986, for tax year 1987. Appellants did not disagree in the trial court with Mr. Harps' methodology or the capitalization rate, but objected to this manner of deriving "stabilized annual net income," because it relies on actual net income figures after the assessment dates that neither a willing buyer in determining whether to purchase property on the assessment dates nor the District's tax assessor in making assessments would have been able to refer to.

While this court has recognized that appraisers often calculate a property's income earning potential by reference to the trend of actual net income figures over the past several years, *District of Columbia v. Washington Sheraton Corp., surpa,* 499 A.2d at 115, this is not the only acceptable method. The statute authorizes consideration of "any factors" that may bear on value, D.C.Code § 47–820(a) (1990) (any factors which might have a bearing on the market value of the real property must be taken into account, including income earning potential, if any), and the regulations require an appraiser to use the most current, accurate and conclusive information in assessments. 9 DCMR § 306.2; *see also* 9 DCMR § 307.1(e). Thus, in *Wolf v. District of Columbia, supra,* 597 A.2d at 1306, the court recognized that the District may take new information, obtained after suit was filed, and revise its estimate of value. Furthermore, in *District of Columbia v. Washington Sheraton Corp., supra,* the court stated that, "[i]n some circumstances ... a short hand approach permits [an] assessor to utilize as the stabilized net income the existing [building's] 'actual operating revenues and expenses for either the year prior to or subsequent to the date of value.'" 499 A.2d at 115 (quoting Rushmore & Rubin, *The Valuation of Hotels and Motels for Assessment Purposes,* APPRAISAL JOURNAL, at 277 (Apr.1984)). In that case, renovation construction had artificially depressed the annual income of a hotel, and the assessor relied on the six months of income data after the valuation date. *Id.* at 114. The court noted that, according to the record in that case, "this short hand method has frequently been used in the District." *Id.* at 115. While

---

**11.** By contrast, Mr. Harps stated that the Market Data (comparable sales) Approach is seldom used because it "requires information with regard to the sold properties used as comparables equal to the information which the appraiser has about the property to be appraised," which data, he explained, "generally cannot be obtained by the appraiser ... [or] is confidential...." The trial judge found that the District government's assessment manual supported Mr. Harps' opinion about the use of the market data approach. The trial judge also noted Mr. Harps' reasons for rejecting the replacement cost approach in light of the age of the property, and the relative difficulty of dealing with a large amount of depreciation that might be deducted from the cost new, in view of the fact that "downtown office buildings only 25 years old are often torn down due to their inability to compete with the newer buildings for tenants."

the court expressed no disapproval with the overall use of the "short hand method," [12] it did conclude that application of the approach was inappropriate where actual net income was based on an atypical year in which the building's operations were significantly reduced on account of renovations. *Id.* Under such circumstances, the court concluded that market value would be understated. *Id.*

The record demonstrates that Mr. Harps utilized the "shorthand method" described in *District of Columbia v. Washington Sheraton Corp., supra.* For tax years 1986 and 1987, he used "actual operating revenues and expenses for … the year … subsequent to the date of value" as a stabilized annual net income figure. *Id.* at 115. Mr. Harps testified that a buyer would base his or her estimate of value on future earnings potential rather than just past years' earnings, and appellants did not dispute his testimony. Mr. Harps provided, moreover, both professional and practical reasons for using actual income information. First, he cited five texts to support his testimony that the income approach to valuation determines market value based on the income the property is likely to produce after the valuation date. Further, in using the actual income and expense data, Mr. Harps explained that he did not accept the futures uncritically, but compared them with other rents, lease terms and expenses of buildings in the downtown area near appellants' property.[13] Moreover, unlike the circumstances in *District of Columbia v. Washington Sheraton Corp., supra,* there is nothing to suggest that the net operating income of appellants' property for 1985 or 1986 was distorted by a "disrupt[ion] [in] the usual operation of the [office building]," and appellants do not argue to the contrary. 499 A.2d at 115.

The judge, in crediting Mr. Harps' methodology, found that Mr. Harps had relied on actual annual net income, determined by reference to the "actual income and expense pattern generated by the property over a number of years," "found a stable income pattern … [that was] supported by comparable market rents," and applied "a capitalization rate reflecting the rate the taxpayer must recover annually to pay the mortgage, to obtain fair return equity, and to pay real estate taxes." Appellants offered no expert evidence to counter Mr. Harps' methodology or to show that his valuations were erroneous. Their contention that his use of actual income data for 1985 in determining value for tax year 1986, and actual income data for 1986 in determining value for tax year 1987, was contrary to the requirements of a stabilized income approach, misses the mark. The actual net income was the future income for the tax year at issue, based on the most current and accurate information that was available to him at the time he prepared his appraisals. Mr. Harps' use of actual income was consistent with the statute and regulations. *See Safeway Stores, Inc. v. District of Columbia, supra,* 525 A.2d at 211 ("a taxpayer bears the burden of proving that an assessment is incorrect or illegal, not merely that alternative methods exist giving a different result"). Therefore, we find no error by the trial judge in crediting Mr. Harps' methodology.

### III

Appellants also contend that the trial judge erred by accepting Mr. Harps' appraisals of land values, based on the comparable sales approach, without making any findings of fact as to specific land sales that Mr. Harps used in concluding that the District government assessor's land value was not unreasonable, and that

---

12. In arguing to the contrary, appellants' reliance on *Brisker v. District of Columbia,* 510 A.2d 1037 (1986), is misplaced. In that case the court held that consideration of comparative sales data subsequent to the statutory valuation date in applying the comparative sales approach to valuation was inappropriate. *Id.* at 1038. By contrast, the issue in the instant case is whether consideration of actual annual net income data subsequent to the valuation date is appropriate in applying the income approach to valuation.

13. Mr. Harps testified that the income from appellants' property was rising very rapidly at the time, increasing between 1982 and 1986 by 105.3 percent.

there was no explanation of the basis for a 37.5 percent increase in the assessment between 1986 and 1987. Thus, appellants maintain, Mr. Harps' appraisal was flawed by his decision to adopt the land values of the District government's assessors. *See* D.C.Code § 47–3303. The trial judge rejected appellants' contention that Mr. Harps had not adequately explained his reasons for accepting the District government assessor's land valuation. Because appellants offered no evidence that provided a reasonable basis for questioning the land valuations, their claim is meritless.

■ The record demonstrates that Mr. Harps did not blindly accept the District government assessor's land values, which were based on three lists of comparable sales. *See* 9 DCMR § 307.3 (arms length sales). The District's land valuations for tax year 1986 were the same as for tax year 1985, and the valuations for tax years 1986 and 1987 were affirmed by the Board of Equalization and Review. In response to a question from appellants' trial counsel on whether he "just accepted the assessors['] [figures]," Mr. Harps testified:

> No, I didn't just accept it. I looked at my list of land sales and I have every land sale made in the District of Columbia in downtown Washington, about 250 sales, including everything—beginning with January 1980. And I looked through the list of sales at or about the time and saw what the prices at which properties had sold—land had sold. I looked and saw what the Government put on it and I said, this is in the ballpark.

Mr. Harps also informed the judge that had he performed his own independent appraisals, there would not have been a five percent difference with those of the District government appraiser's. *See* D.C.Code § 47–825(f). He further explained that the

37.5 percent increase was warranted by the market, where the same land had increased from $100 per square foot to $1,500 per square foot in the District of Columbia over the prior ten years. He noted that the net operating income from appellants' property had increased 38.6 percent between 1982 and 1983 and 105.3 percent between 1982 and 1986.

■ Furthermore, that Mr. Harps quoted no comparable sales figures in his testimony or his report does not render his appraisal unpersuasive or incomplete. Mr. Harps testified that he had comparable land sales figures that he was prepared to quote if asked, but appellants' trial counsel chose not to question him about them. Appellants offered no evidence of comparable sales to support their assertions. Thus, appellants failed to "raise and delineate" their objections to the comparative land values at trial, and they "failed to inform the trial court of the flaws [they] perceived in [Mr. Harps'] ... valuations of the land." *Safeway Stores Inc. v. District of Columbia, supra,* 525 A.2d at 214. Therefore, their objection to the absence of findings of fact by the trial judge regarding the comparable land sales on which Mr. Harps relied comes too late. *See Clifford v. United States,* 532 A.2d 628, 638–39 (D.C.1987) (basis for expert's opinion need not be stated by expert, but may be left to cross-examination).

The trial judge's findings of fact refer to Mr. Harps' consideration of land sales in the vicinity near the appraisal date. *See George Washington University v. District of Columbia, supra,* 563 A.2d at 761 & n. 3. The findings were not more specific, and the judge did not explicitly explain why the flaws that caused the court to reject the District government appraiser's methodology were not also defects in Mr. Harps' appraisals.[14] But the judge found that Mr.

---

14. The trial judge's findings of fact referred to the seven sales of office buildings in the central business district between 1981 and 1984 that were relied on by the District government assessor, as well as the market data on sales of unimproved commercial property and land in the same area as appellants' property that the District government assessor used. However,

the trial judge criticized the District government appraiser's methodology for valuation on the grounds, for example, that the comparable sales used predated the tax years at issue and did not show that the comparables were economically similar to appellants' property. The judge also found that the estimate of value by the District

Harps' approach, after considering, *inter alia*, all land sales in the downtown area since 1980 and comparables and a "thorough onsite examination of the property," in concluding that the District government appraiser's valuations were reasonable, was "not unreasonable." Mr. Harps clearly did not have the same interest in the outcome as appellants' value witness and the District government's value witness, *see* note 5, *supra*, and he was deemed eminently qualified by the trial judge as an expert appraiser, and appellants and the District so stipulated. Since appellants, although afforded the opportunity, did not attack the comparable sales on which Mr. Harps relied, there was no obligation on the trial judge to make specific findings on those sales.

■ Finally, appellants' contention that the trial judge erred in accepting appraisals that included a 37.5 percent increase between the two tax years also fails because Mr. Harps' appraisals included detailed data on comparable rental income, and he explained the basis for his valuation of the land as unimproved land. Appellants' reliance on D.C.Code § 47–802(4) (market value based on willing buyer standard) is misplaced; the statute does not prescribe a valuation method for land as distinct from the improvements on the land.

Accordingly, we affirm the judgment of January 23, 1991, and the order of February 26, 1991.

government appraiser was not supported by a     preponderance of the evidence.