# District of Columbia
# Court of Appeals

No. 15-CV-959

CHH CAPITAL HOTEL PARTNERS, LP,

Appellant,



v.

CVT-9455-09

DISTRICT OF COLUMBIA,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE: FISHER and BLACKBURNE-RIGSBY, *Associate Judges*; and NEBEKER, *Senior Judge.*

## JUDGMENT

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of the Superior Court is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: February 2, 2017.

Opinion by Associate Judge John Fisher.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CV-959

CHH CAPITAL HOTEL PARTNERS, LP, APPELLANT,

FILED 2/2/17
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CVT-9455-09)

(Hon. John M. Campbell, Trial Judge)

(Argued December 19, 2016                    Decided February 2, 2017)

*Steven W. Zoffer* for appellant.

*Mary L. Wilson*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for appellee.

*Ralph A. Taylor, Jr.*, and *Matthew Wright* filed a brief for amicus curiae Omni Shoreham Corporation in support of appellant.

Before FISHER and BLACKBURNE-RIGSBY, *Associate Judges*, and NEBEKER, *Senior Judge*.

FISHER, *Associate Judge*: Every year the District of Columbia ("the District") estimates the market value of real property to assess taxes.[1] Appellant CHH Capital Hotel Partners, LP ("CHH"), owner of the Capital Hilton Hotel ("Capital Hilton" or "the Hotel"), contends that the Superior Court erroneously sustained an assessment for the 2009 tax year that failed to properly distinguish the value of the Hotel's real property from the value of its other business components. We hold that the trial court did not err in concluding that CHH had failed to carry its burden of proof. Finding no reversible error with respect to the other rulings challenged on appeal, we affirm.

## I.    Factual Background

The Capital Hilton, located at 1001 16th Street, Northwest, is a 14-story, full-service hotel offering, among other things, 544 guestrooms, a restaurant, meeting spaces, and a health club. The hotel building was originally constructed and opened for business during the Second World War. CHH purchased the Hotel in 2007.

---

[1]    D.C. Code § 47-820 (a)(3) (2001) ("The assessed value for all real property shall be the estimated market value of such property as of the valuation date . . . ."); 9 DCMR §§ 305.1 ("All real property shall be assessed on an annual basis."), 305.3 ("'[A]ssess' means to value real property for tax purposes.").

Larry Hovermale, an assessor with the District's Office of Tax and Revenue ("OTR"), conducted the 2009 tax year assessment of the Hotel, valuing its real property—the land and improvements on the land[2]—as of the January 1, 2008, valuation date. Using the income capitalization approach,[3] Mr. Hovermale initially assessed the real property at $124,937,100. CHH administratively appealed the assessment, and OTR sustained Mr. Hovermale's valuation.

CHH next appealed to the Board of Real Property Assessments and Appeals[4] ("BRPAA" or "the Board"). Prior to the Board's hearing on the matter, OTR accepted additional information, including an income and expense report for the 2008 calendar year and a CHH plan forecasting substantial capital outlays for the

---

[2] D.C. Code § 47-802 (2001) (defining "real property" as "real estate identified by plat . . . together with the improvements thereon").

[3] Under District regulations, assessors may apply one or more of the three generally recognized approaches to valuation—the comparable sales approach, the cost approach, or the income capitalization approach. 9 DCMR § 307.2; *see also Safeway Stores v. District of Columbia*, 525 A.2d 207, 209 (D.C. 1987) (holding that District assessors "must consider all three and have a reasoned basis for picking one over the other two").

[4] The legislature has since abolished the Board and established a replacement body: the Real Property Tax Appeals Commission. *See* D.C. Code § 47-825.01 (2001), *repealed by* D.C. Law 18-363, § 2 (b)(2), 58 D.C. Reg. 963, 963 (2011).

next five years. Mr. Hovermale updated his income and expense projections, accepted and discounted some—but not all—of the intended capital expenditures, and submitted to the Board a revised assessment of $118,701,607. Explaining only that it had "accept[ed] the [OTR] recommendation for a reduced value," the Board nevertheless lowered the assessment to $113,148,379. CHH paid the taxes levied against the Hotel and appealed to the Superior Court, seeking a reduction in the assessed value and a refund of excess taxes paid.

The taxpayer bears the burden of proving that the District's assessment is "incorrect or illegal, not merely that alternative methods exist giving a different result." *Safeway Stores*, 525 A.2d at 211; *see also* Super. Ct. Tax R. 12 (b). At a four-day trial, CHH presented testimony from real estate appraisal expert David Lennhoff, who criticized the District's use of a form of the income capitalization method known as the "Rushmore Approach"[5] (for its creator Stephen Rushmore) and championed an alternative—one he had developed—called the "Business

---

[5] OTR assessor David Clark testified that Mr. Hovermale's methodology appeared to be consistent with the Rushmore Approach. In its order, the trial court stopped short of declaring that the District had, in fact, faithfully applied the Rushmore Approach as described in valuation literature, noting only that the method followed by the District was "patterned on the Rushmore Approach" and that "the District purported to follow what is generally called the 'Rushmore Approach.'" For simplicity's sake, we nonetheless refer to Mr. Hovermale's assessments as applications of the Rushmore Approach.

Enterprise Approach" ("BEA" also known as the "Lennhoff Approach"). Using BEA, Mr. Lennhoff valued the Hotel's real property at $95,700,000. In conducting his analysis, he assumed that the Hotel would undergo major renovations planned for 2008 even though, at the time he assessed the property, he was aware that CHH did not, in fact, renovate as projected. Since on the valuation date, a prospective buyer would not have known about the ultimate departure from the renovation plans, Mr. Lennhoff thought it inappropriate to consider the actual income collected and expenses incurred after the valuation date.

David Clark, an assessor with OTR, described the Rushmore-based process Mr. Hovermale had apparently used to assess the Capital Hilton.[6] Rafael Menkes, a major properties assessor with OTR—who the court permitted to testify as an expert for the District in spite of CHH's contention that he was not sufficiently experienced in hotel valuation—testified that, using the Rushmore method, he valued the Hotel's real property at $126,432,000. He also explained the logic underlying Mr. Hovermale's assessments and pointed out flaws in the methodology backed by Mr. Lennhoff.

---

[6] Mr. Hovermale had retired from OTR and did not testify at trial. Prior to testifying, Mr. Clark reviewed the OTR file on the 2009 tax year assessment of the Capital Hilton.

The testimony revealed that both the Rushmore Approach and BEA use historical operating revenue and expenses to project a company's future net income.[7] Further, under both methods, appraisers identify and deduct income derived from intangible property and personal property to isolate income attributable to real property.[8] The approaches diverge on the details of implementation. With regard to intangible assets, the Rushmore Approach deducts

---

[7] In *District of Columbia v. Rose Assocs.*, 697 A.2d 1236 (D.C. 1997), we explained:

> Th[e income capitalization] method of valuation can be summarized by the formula $V = I/R$, where V is the present value of the property, I is the annual income generated by the property, and R is the capitalization rate. R represents a percentage ratio between the annual income expected to be generated by a building and the price a ready, willing and informed buyer would be willing to pay for it in [a] given year.

*Id.* at 1236 n.1.

[8] An operating hotel is a unique form of real estate with four distinct components: land, improvements, personal property, and the going business (or intangible property). Because only the value of the land and improvements is properly considered when taxing real property, the income attributable to the other components must be subtracted from I to arrive at an income attributable only to real property. The formula described in *Rose Assocs.* can be modified as follows: $V(RP) = (I - I(PP) - I(GB))/R$, where V(RP) is the value of real property, I(PP) is the income associated with personal property, and I(GB) is the income associated with the going business. The parties agreed at trial that the Hotel should be assessed under this general approach.

management and franchise fees and, if necessary, adjusts for any residual intangibles. BEA takes these deductions and another for business start-up costs. Mr. Lennhoff contended at trial that the business start-up deduction removes from the income stream unaccounted-for costs associated with getting a hotel up and running—assembling and training a workforce, advertising a new business, and the like—which remain in the value of the property. He maintained that such a deduction is necessary even when valuing a property like the Capital Hilton, which has been operating since the 1940s. Devotees of the Rushmore Approach insist that hotels are constantly in "start-up mode," acquiring new customers regularly and facing high staff turnover. Accordingly, any relevant costs, they argue, are already captured in the hotel's recurring expenses and, thus, a separate deduction for business start-up costs is unnecessary.

With regard to the personal property component, appraisers recognize that a hotel derives income from its furniture, fixtures, and equipment ("FF&E").[9] Both the Rushmore Approach and BEA advocate two types of deductions to remove income derived from FF&E from the total income stream: one type adjusts for

---

[9] The logic is that when a customer rents a hotel room, she pays not only to use the physical space—as with, for example, rental of an unfurnished apartment—but also to use the hotel's furniture, lighting, kitchen, laundry equipment, and the like.

return *of* FF&E (essentially, return of the amount originally invested in a hotel's FF&E) and the other accounts for return *on* FF&E (a hotel's profit on the investment in FF&E currently in place). Followers of the Rushmore Approach calculate return of FF&E based on a hotel's annual contribution to a reserve used to regularly replace furnishings. They determine return on FF&E by multiplying the depreciated cost to replace the FF&E currently in place by an estimated rate of return on that investment.

Mr. Lennhoff tackles FF&E differently. In calculating income attributable to FF&E for the Capital Hilton, he multiplied the value of the Hotel's personal property, amortized over its useful life, by an estimated rate of return[10] to derive annual income for both return of and return on FF&E. According to Mr. Lennhoff, appraisers should not use the replacement allowance to estimate return of FF&E because the replacement allowance is "just an ongoing operating expense," and "a completely different concept" from return of FF&E.

---

[10] Mr. Lennhoff used hotel mortgage rates as a base then added a premium to arrive at an estimated rate of return on the Hotel's personal property.

Having calculated a business's net operating income attributable to real property, appraisers next divide by a capitalization rate,[11] and then determine the present value of portions of the income stream that will be received in the future, to arrive at the present-day capitalized value of net operating income derived from only real property ("capitalized NOI (RP)"). In his revised assessment, Mr. Hovermale calculated a capitalized NOI (RP) of $128,786,112. Mr. Lennhoff and Mr. Menkes came up with capitalized NOI (RP) of $126,668,990 and $126,431,842, respectively.

Mr. Hovermale and Mr. Lennhoff made further adjustments after determining capitalized NOI (RP). Mr. Hovermale deducted $9,786,544, the

---

[11] The capitalization rate is "a number representing the percentage rate that taxpayers must recover annually to pay the mortgage, to obtain a fair return on the taxpayers' equity in the property, and to pay real estate taxes." *Rock Creek Plaza-Woodner Ltd. P'ship v. District of Columbia*, 466 A.2d 857, 859 (D.C. 1983). We have noted in prior cases that "the determination of an appropriate capitalization rate for a particular year for a particular property is a fact-specific determination not susceptible to a singular definition." *Rose Assocs.*, 697 A.2d at 1238. CHH does not appear to be challenging the trial court's finding that the capitalization rate used by the District was "properly derived." Accordingly, we deem such an argument to have been waived. *See McFarland v. George Washington Univ.*, 935 A.2d 337, 351 (D.C. 2007) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 554 n.9 (D.C. 2001))).

present value of some of CHH's planned capital expenditures.[12] Mr. Lennhoff deducted $28,600,000 to account for renovations planned for 2008. At trial, he explained that this post-capitalization deduction included both renovation expenditures related directly to the real estate and those related to personal property. But he contended that the deduction was necessary because "[y]ou can't get th[e level of projected] revenue if you don't do the renovation." Mr. Menkes testified that nearly $16 million of Mr. Lennhoff's $28.6 million in renovation expenses double-counted FF&E that had already been deducted before capitalization.

Unpersuaded by Mr. Lennhoff's critique of the District's approach, Judge Campbell concluded that CHH had not carried its burden of proving that the District's assessment was incorrect or illegal and had not shown that BEA was clearly superior to the Rushmore Approach. To the contrary, Judge Campbell deemed the District's "well-established and broadly accepted" method "well-conceived to yield a fair and accurate estimate of market value" and "fully supported by the evidence."

---

[12] It appeared to Mr. Clark that Mr. Hovermale did not deduct expenses that he felt should not fall under the category of capital expenditures.

First, Judge Campbell found it "interesting" that some of Mr. Lennhoff's underlying assumptions and projections were proven inaccurate by the Hotel's actual income and expenses after January 1, 2008 (the valuation date). Most significantly, renovations did not begin in 2008. And although these differences did not prove "materially important to the Court's analysis,"[13] "the fact that things turned out differently may reveal a flaw in the assumption itself." Then, focusing primarily on the differences between the Rushmore Approach and BEA, he found the extra deductions advocated by Mr. Lennhoff unwarranted. Judge Campbell agreed with Mr. Menkes and the District that the additional FF&E deduction double-counted the value of personal property, and he "d[id] not find . . . plausible on either a practical or theoretical level" Mr. Lennhoff's contention that an assessor must calculate and deduct start-up costs incurred, in this case more than six decades earlier. He also acknowledged that Mr. Menkes had relatively scant formal training and experience valuing hotels like the Capital Hilton and remarked that he "g[a]ve[] little weight to [Mr. Menkes's] expert opinion." Judge Campbell sustained the District's $118,701,067 assessment, but, reasoning that "the taxpayer should be no worse off than if [it] had not appealed to this Court[,]" declined to upwardly adjust BRPAA's assessment of $113,148,379.

---

[13] Judge Campbell took note of the "relatively small" difference between Mr. Hovermale's and Mr. Lennhoff's capitalized NOI (RP) before final adjustments.

## II.    Analysis

### A.    The Trial Court Did Not Err in Finding That CHH Failed to Meet Its Burden of Proving the District's Assessment Incorrect or Illegal

In reviewing decisions of the Superior Court in civil tax cases, as in other civil cases tried without a jury, "[w]e must accept the judge's findings of fact unless they are clearly erroneous, and we will not set aside a conclusion of law unless it is plainly wrong or without evidence to support it." *District of Columbia v. Wash. Sheraton Corp.*, 499 A.2d 109, 111 (D.C. 1985); *see also* D.C. Code § 47-3304 (a) (2001). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Wolf v. District of Columbia*, 597 A.2d 1303, 1308 (D.C. 1991) ("*Wolf I*") (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). Moreover, we "will not upset the ultimate legal conclusion of the tax court when its outcome necessarily follows from its findings of fact." *Hospitality Temps Corp. v. District of Columbia*, 926 A.2d 131, 134 (D.C. 2007).

CHH argues that the trial court erred as a matter of law in approving an assessment methodology that did not properly isolate the value of the Capital

Hilton's real property from the value of its other business components. In other words, it asserts that the assessment was illegal because it taxed more than real property. The District contends that the issues before the trial court were primarily factual in nature, and that the trial court did not clearly err in resolving in the District's favor conflicting evidence on how best to value the Hotel's real property.

For three combined reasons, we agree with the District's framing of the issues. First, the Superior Court evaluates appeals from real property assessments de novo, affording no deference to OTR's or BPRAA's prior assessments. *District of Columbia v. N.Y. Life Ins. Co.*, 650 A.2d 671, 672 (D.C. 1994); *see also* D.C. Code §§ 47-825.01 (repealed 2011), 47-3303. Though the taxpayer bears the burden of proving the District's assessment "incorrect or illegal," *Safeway Stores*, 525 A.2d at 211, the "court's task is not to conduct a review of agency action. Rather, the court must make an independent valuation of the property on the basis of the evidence presented at trial." *N.Y. Life Ins. Co.*, 650 A.2d at 672. The trial court is the fact-finder to whom we defer on factual matters.

Second, many courts have historically regarded valuation of property as a factual issue. *See, e.g.*, *CSX Transp. v. Ga. State Bd. of Equalization*, 552 U.S. 9, 19 (2007) ("Valuation of property, though admittedly complex, is at bottom just

'an issue of fact about possible market prices.'" (quoting *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 741 (1997))); *Crawford v. Helvering*, 63 App. D.C. 140, 141, 70 F.2d 744, 745 (1934) ("[T]here is no definite formula by which to determine fair market value as that term is used in the tax statutes. The question, as all agree, is necessarily one of fact to be determined by the evidence."). A review of our civil tax cases indicates that we have treated real property valuation questions this way. *See, e.g.*, *Bender v. District of Columbia*, 804 A.2d 267, 268–69 (D.C. 2002) (reviewing the trial court's valuation determination for clear error); *Wash. Sheraton Corp.*, 499 A.2d at 112 (same); *District of Columbia v. Burlington Apartment House Co.*, 375 A.2d 1052, 1055 (D.C. 1977) (same); *see also Square 345 Assocs. Ltd. P'Ship v. District of Columbia*, 721 A.2d 963, 966 (D.C. 1998) ("It is within the trial court's broad discretion as the finder of fact to sift through the evidence and arrive at an independent valuation.").

And third, this court has long adhered to the view that "[c]ontradictory expert testimony presents an issue of fact for the factfinder." *Designers of Georgetown, Inc. v. E.C. Keys & Sons*, 436 A.2d 1280, 1280 (D.C. 1981); *see also, e.g.*, *Burke v. Scaggs*, 867 A.2d 213, 220 (D.C. 2005) ("[O]ne of the essential functions of the fact-finder is to resolve discrepancies between witnesses, including

experts."). In so doing, we have recognized that "the trial court is in the best position to evaluate the experts' qualifications, demeanor, experience, reasoning, and testimony." *Rock Creek Plaza-Woodner Ltd. P'ship*, 466 A.2d at 860. In light of those underlying principles, it would be peculiar to call the trial court's inquiry here—one resolving conflicting expert opinions to estimate the market value of a particular hotel property given its unique characteristics—anything other than factual in nature.

Moreover, we find no basis for the rigid, matter-of-law ruling CHH requests. The District's real property taxation scheme affords assessors great—though not, of course, boundless—flexibility in selecting an appropriate methodology to derive estimated market value. *See Young Women's Christian Ass'n of Nat'l Capital Area, Inc. v. District of Columbia*, 731 A.2d 849, 851 (D.C. 1999) (observing that the District is "given sizeable discretion in 'choosing the method or approach for an assessor to use in estimating the market value of a particular property'" (quoting *Wolf I*, 597 A.2d at 1308)). Regulations provide that assessors must "take into account all available information which may have a bearing on the market value of real property," including specifically enumerated factors. 9 DCMR § 307.1. They must also consider using the three basic approaches to estimating market value and

must have a reason for picking a particular method.[14] *Safeway Stores*, 525 A.2d at 209. Little else is required, and, thus, a trial court presented with the District's assessments as evidence of the market value of a particular property has little reason to expect adherence to one school of thought or another. We can imagine good reasons why the legislature might favor flexibility in this regard. Indeed, the vigorous debate at the trial level of this case reveals that technical methodology and best practices are subject to challenge and change over the years. In any event, the legislature is surely not barred from adopting stringent rules for assessors and could have done so if it wanted. We decline to act in its stead.

Having settled the appropriate standard of review, we move to CHH's specific claims of error. We hold that the trial court did not clearly err in finding that the District's valuation method "isolate[d] the different categories of value and remove[d] those unrelated to the land and the capital improvements . . . in a logical and generally accepted manner." Nor did the trial court clearly err in finding Mr. Lennhoff's approach lacking in this case because, in the court's opinion, it double counted FF&E and unnecessarily deducted business start-up costs. We find

---

[14] An assessor may not even be obligated to adhere to one of the three generally accepted methods of valuation, as the regulation provides that assessors may use "any other method the Deputy Chief Financial Officer deems necessary to arrive at estimated market values." 9 DCMR § 307.3.

nothing impermissible about the trial judge's view of the evidence, and, therefore, we must defer to that view. *Wolf I*, 597 A.2d at 1308.

## B. Other Issues

CHH raises five additional issues, which we address more summarily. First, CHH argues that because the District did not defend BRPAA's $113,148,379 assessment, the trial court should have required both the District and CHH to prove their respective assessments correct. We disagree. This court has held that "[o]nce the case has come before the Superior Court, the District is entitled to attempt to establish that the value of the property is in excess of the assessed value." *N.Y. Life Ins.*, 650 A.2d at 673. To do so, the District must necessarily argue that the Board's assessment is in some way lacking. Such an argument in no way relieves the taxpayer of the obligation of showing that the District's official assessment, on which the tax obligation was based, was incorrect or illegal. *See id.* at 672 ("[I]f the taxpayer cannot establish that the assessment is incorrect or illegal, then the taxpayer is bound by it; the assessment stands as to him."). The District's decision to argue that BRPAA's assessment was too low did not constitute abandonment. *See Wolf I*, 597 A.2d at 1312 (finding no abandonment in similar circumstances).

Second, CHH contends that the trial court incorrectly described the burden at trial. The trial court stated that CHH had to prove that Mr. Hovermale's revised valuation of $118,701,067 was derived through an incorrect or illegal methodology to prevail; CHH maintains that the assessment at issue at trial was the Board's $113,148,379 valuation. We are satisfied that any imprecision in the trial court's articulation of CHH's burden was harmless.

In conducting harmless error analysis in civil cases, we consider whether a defect in the proceeding "affect[ed] the substantial rights of the parties." Super. Ct. Civ. R. 61; *see also* Super. Ct. Tax R. 3 (applying Super. Ct. Civ. R. 61 in actions brought in the Tax Division of the Court). Here, there is no indication that CHH's substantial rights were affected. CHH's witnesses discussed at length Mr. Hovermale's assessments, as submitted to the Board. Though, regrettably, there is no indication why the Board departed below Mr. Hovermale's revised assessment, CHH had the tools to attack both the $113,148,379 and $118,701,607 valuations. The trial court found that CHH had not succeeded in undermining the District's methodology—the same methodology apparently underlying both Mr. Hovermale's revised assessment and the Board's assessment——and found Mr. Lennhoff's alternative approach lacking. Perhaps more significantly, the trial

court, considering all of the evidence as to value of the real property de novo, affirmatively accepted Mr. Hovermale's $118,701,607 valuation, but nonetheless declined to increase the assessment beyond the Board's figure of $113,148,379. CHH suffered no prejudice from the trial court's framing of the burden.

Third, CHH claims that the trial court wrongly admitted expert testimony from Mr. Menkes, an assessor with OTR who had only limited experience valuing hotels of the sort at issue in this case. We have held that "[t]he trial judge has wide latitude in the admission or exclusion of expert testimony and his [or her] decision with respect thereto should be sustained unless it is manifestly erroneous." *Jones v. United States*, 990 A.2d 970, 977 (D.C. 2010) (alteration in original) (quoting *In re Melton*, 597 A.2d 892, 897 (D.C. 1991) (en banc) (internal quotation marks omitted)). Here, Mr. Menkes had an undergraduate degree in Finance and had completed some postgraduate economics coursework, after which he worked for more than four years as a stock broker. He had also spent nearly three years managing a hedge fund before moving on to a career in real estate assessment. As an assessor, he had worked for nearly ten years with the Los Angeles County, California, assessor's office, worked with the City of Los Angeles as a real estate officer, and then moved on to OTR, where he had worked for nearly two years at the time of trial. Mr. Menkes explained that he had valued about five hotels as an

assessor with Los Angeles County, but nothing of the size of the Capital Hilton. He also testified that he had attended a two-hour webinar on hotel valuation in which Mr. Rushmore and Mr. Lennhoff discussed specific ways to value a hotel and debated their respective approaches. We find no manifest error in the trial judge's admission of Mr. Menkes's expert testimony.[15]

Fourth, CHH claims that the trial judge arbitrarily discounted Mr. Lennhoff's expert testimony. A trial judge may reject the testimony of a taxpayer's expert if there is "some basis in the record to support the conclusion 'that the evidence of the taxpayers' witnesses is unworthy of belief." *Rock Creek Plaza-Woodner Ltd. P'Ship*, 466 A.2d at 859 (quoting *Cullers v. Commissioner*, 237 F.2d 611, 616 (8th Cir. 1956)). CHH contends that the trial court "disregarded Mr. Lennhoff's testimony because it thought Mr. Lennhoff took inappropriate deductions, when in fact, Mr. Lennhoff was removing tangible and intangible personal property from the value of the real estate in accordance with the law." We disagree. The trial court was not bound to agree with Mr. Lennhoff's expert opinion regarding the correct way to value this hotel's real property. *See Mann v.*

---

[15] It bears mention that Judge Campbell ultimately agreed that Mr. Menkes had relatively scant formal training and experience valuing hotels like the Capital Hilton and "g[a]ve[] little weight to [Mr. Menkes's] expert opinion." Nevertheless, the court concluded that Mr. Menkes "shed valuable light on the mechanics of both approaches, as well as on their differences."

*Marshall*, 227 A.2d 769, 771 (D.C. 1967) ("Although an expert may give an opinion in his particular field, it is not controlling but is to be considered in connection with all other evidence in the case. No rule of law compels the trier of facts to be bound by the opinion of an expert and he need not surrender his own judgment unless from all the evidence he finds the expert opinion to be correct.") (citations omitted); *Urciolo v. Sachs*, 62 A.2d 308, 309 (D.C. 1948) ("Rarely is expert testimony as to value binding on the trier of facts and it is never binding when inconsistent with other evidence in the case."). Here, the trial court's view is supported by other record evidence which contradicts Mr. Lennhoff's opinion. Accordingly, we find nothing impermissible about the court's failure to accept Mr. Lennhoff's view.

Finally, CHH argues that the trial court abused its discretion by considering the hotel's actual operating revenue and expenses after the valuation date. The trial court recognized that, "[s]trictly speaking," an appraiser is not to consider post-valuation-date facts in assessing a property. Neither the District nor CHH points us to authority squarely addressing whether it is permissible for a trial judge to use revenue and profit data as Judge Campbell did here: as a catalyst prompting "re-examin[ation of] the bases of [an expert's] assumptions . . . in light of the fact

that [those assumptions] turned out to be wrong."[16]  Here, these considerations were "not materially important to the Court's analysis" as the court rejected Mr. Lennhoff's testimony for other reasons, as detailed above.  Assuming without deciding that the trial court erred in admitting and considering this evidence, we find such error harmless.

### III.  Conclusion

For the foregoing reasons, the judgment of the Superior Court is hereby

*Affirmed.*

---

[16]  We agree with CHH that the District overreads *Wolf v. District of Columbia*, 611 A.2d 44 (D.C. 1992) ("*Wolf II*").  *Wolf II* commented only on the use of actual income and expense data from the year after the valuation date to derive a company's stabilized net income.  *See id.* at 48–50.  It did not confer "broad discretion to admit the 2008 data when reviewing the different assessments at trial," as the District asserts.