*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CV-285

ESTELLE DAVIS, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB 2880-16)

(Hon. John M. Campbell, Trial Judge)

(Argued October 8, 2020            Decided September 16, 2021)

*Susan L. Kruger*, with whom *Sara Safriet* was on the brief, for appellant.

*Graham E. Phillips*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Carl J. Schifferle*, Acting Deputy Solicitor General, were on the brief, for appellee.

Before GLICKMAN and THOMPSON[*], *Associate Judges*, and WASHINGTON, *Senior Judge*.

---

[*] Judge Thompson was an Associate Judge of the court at the time of argument. Although Judge Thompson's term ended on September 4, 2021, she continues to serve as an Associate Judge until her successor is confirmed. See D.C. Code § 11-1502 (2012 Repl.) ("Subject to mandatory retirement at age 74 and to the provisions of subchapters II and III of this chapter, a judge of a District of Columbia court appointed on or after the date of enactment of the District of Columbia Court

GLICKMAN, *Associate Judge*: Estelle Davis claims that the District of Columbia Office of Tax and Revenue ("OTR") fired her for disclosing that its method for appraising certain properties in Georgetown was "wrong" and perpetuating "an unlawful tax scam." She claims OTR was grossly undervaluing those properties and, as a result, costing the District "millions in lost tax revenue." After Ms. Davis was fired, she sued to hold the District liable for her termination under the D.C. Whistleblower Protection Act ("DCWPA"), D.C. Code §§ 1-615.51 *et seq.* (2016 Repl.). The Superior Court granted summary judgment to the District, on the ground that Ms. Davis did not make a "protected disclosure" as defined by D.C. Code § 1-615.52(a)(6) (2016 Repl.). The court also denied her leave to amend her complaint to add a claim for wrongful discharge in violation of public policy, primarily on the ground that the claim was futile. Ms. Davis challenges both of those decisions on appeal. For the following reasons, we affirm.

---

Reorganization Act of 1970 shall serve for a term of fifteen years, and upon completion of such term, such judge shall continue to serve until the judge's successor is appointed and qualifies.").

## I.

## A.

Each year by March 1, OTR must notify real property owners of their tax assessments for the upcoming tax year ("TY").[1] The assessments are based on the property's "estimated market value,"[2] which is the price it would "most probabl[y]" sell for in an arm's length transaction conducted "under prevailing market conditions."[3] Determining that price "is by no means an exact science."[4] "There is no definite formula" or method.[5] Accordingly, OTR has "very broad discretion" to determine which method to use.[6] It "may apply, when appropriate, one or more of the [three] generally recognized approaches to valuation" — the comparable sales

---

[1] D.C. Code § 47-824(a) (2015 Repl.); 9 D.C.M.R. § 311.1.

[2] D.C. Code § 47-820(a)(3) (2015 Repl.)

[3] D.C. Code § 47-802(4) (2015 Repl.).

[4] *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259 (D.C. 2003).

[5] *CHH Cap. Hotel Partners, LP v. District of Columbia*, 152 A.3d 591, 598 (D.C. 2017) (quoting *Crawford v. Helvering*, 70 F.2d 744, 745 (D.C. Cir. 1934)).

[6] *Zirkle*, 830 A.2d at 1259.

approach, the replacement cost ("cost") approach, and the "income" approach.[7] OTR assessors "must consider all three of these approaches," but they can "ultimately rely on one method in determining a property's market value,"[8] so long as they have a reason for doing so.[9] OTR may also apply "any other method" it "deems necessary."[10]

This case concerns two methodologies: the cost and income approaches. The cost approach "bases assessed value on the cost of replacing property with new property of similar utility at present price levels . . . reduced by the amount of depreciation or estimated loss of value because of age, condition, or other factors."[11] It is "applicable to virtually all improved parcels" but is "more reliable for newer structures."[12] It is less reliable for older structures, given that older structures have

---

[7] 9 D.C.M.R. 307.2–307.5 (2021).

[8] *Wolf v. District of Columbia*, 611 A.2d 44, 47 (D.C. 1992) ("*Wolf II*").

[9] *CHH Cap. Hotel Partners, LP*, 152 A.3d at 599.

[10] 9 D.C.M.R. 307.2.

[11] 9 D.C.M.R. 307.4.

[12] International Association of Assessing Officers ("IAAO"), Standard on Mass Appraisal of Real Property 9 (2013), https://www.iaao.org/media/standards/MARP_2013.pdf; https://perma.cc/8LUK-YLZC.

depreciated, and estimating accrued depreciation "can involve considerable subjectivity."[13] The income approach "bases assessed value on the amount that investors would be willing to pay to receive the income that the property could be expected to yield."[14] It is considered the "preferred valuation approach" "for income-producing properties."[15] However, its "successful application . . . requires the collection, maintenance, and careful analysis of income and expense data."[16]

**B.**

As this appeal comes to us from the award of summary judgment to the District, we summarize the material facts before the trial court in the light most favorable to Ms. Davis, accepting her view of disputed facts (except where otherwise indicated).

Ms. Davis started working at OTR in 1998 assessing residential properties. In 2010, she transferred to the unit responsible for assessing "small commercial

---

[13] *See id.*

[14] 9 D.C.M.R. 307.5.

[15] IAAO, *supra* note 12, at 10.

[16] *Id.*

properties" — properties worth $10 million or less — and became a supervisor. To assess those properties, the chief appraiser "told" Ms. Davis "to use the cost approach." She "didn't question" the cost method's applicability at that time.

In 2014, OTR reorganized Ms. Davis's unit. She began overseeing a portfolio of commercial retail and mixed-use properties, both small and large. In this new position, she was responsible for supervising an appraiser named Thomas Frye, and she, in turn, was supervised by the deputy chief appraiser of OTR, Olufemi Omotoso. Her portfolio included properties in Georgetown.

Ms. Davis and her reorganized unit were "swimming in new waters," as she put it in her deposition, because they were not told which appraisal method to use for the commercial and mixed-use properties assigned to them. The cost method had been used in the past, but issues with previous appraisals started to come to light. In August 2014, Ms. Davis testified, Mr. Omotoso and Robert Farr, the Director of Real Property Tax Administration in OTR, told her and Mr. Frye that they were "concerned" previous assessments had undervalued property in Georgetown.

Notably, a property called Georgetown Park had just that month sold for $220 million, but OTR earlier had assessed its value at only $24 million.[17]

In January 2015, Mr. Frye informed Ms. Davis that he thought using the cost approach to estimate the market value of Georgetown commercial retail and mixed-use properties was not just sub-optimal, but flat-out "wrong." Mr. Frye explained this was because many of those properties were too old, and their value too dependent on their income-producing ability, for the cost approach to accurately capture their market value. As a result, Mr. Frye opined, OTR had been "extremely undervalu[ing]" them. Mr. Frye thought the income approach was "the correct approach." Ms. Davis agreed with him. Both of them thought use of the cost approach contradicted industry standards.[18]

In late January or early February 2015, Ms. Davis and Mr. Frye told Mr. Omotoso that the way OTR had been valuing Georgetown properties was "an

---

[17] The $24 million figure may not capture the whole picture. The District contends Georgetown Park comprised two pieces of property: a main lot with a shopping complex and an abutting lot with no improvements. It also contends that the $24 million valuation was only for the unimproved abutting lot. As discussed below, the main lot was significantly more valuable.

[18] The standards Ms. Davis identified were the Uniform Standards of Professional Appraisal Practice ("USPAP") and the IAAO Standard on Mass Appraisal of Real Property, *supra* note 12.

unlawful tax scam" that was "wrong and costing the District millions in lost tax revenue." As she summarized in her interrogatory answers, Ms. Davis

> explained to management that using the cost approach was enriching already rich Georgetown property owners and depriving the District of substantial tax revenue and that the District had to stop and use the correct approach to value, the income approach. By using the incorrect cost approach, the District had for years been subsidizing Georgetown property owners, saving them millions in taxes, to the detriment of the District and other District residents who paid their fair share. . . . [U]tilizing the correct income approach resulted in large increases in proposed values and therefore a much larger and correct tax revenue . . . .[19]

Ms. Davis told Mr. Omotoso that Mr. Frye's proposed TY2016 assessments "for Georgetown commercial retail and mixed-use properties" used the income approach, not the cost approach. According to Ms. Davis, Mr. Omotoso agreed that the income approach should be used and that "we had been losing a lot of money."

Mr. Frye finalized his proposed assessments for TY2016 soon thereafter. He used the income approach to calculate property values for Georgetown commercial

---

[19] On appeal, Ms. Davis says she "was not recommending that the income approach be used on all properties or even all Georgetown properties. Rather, for properties that are not that old and not producing much income, the cost approach could be used supported by sales." However, Ms. Davis expressed that nuanced view only after the fact, when she was deposed in this case.

retail and mixed-use properties instead of the cost approach. His calculations increased assessed values by twenty-one percent overall, relative to assessed values in TY2015. A few of the increases were quite dramatic; the assessed value of one property went up by 545%. Mr. Frye catalogued the percent by which each property assessment changed from TY2015 in a "percent change report." Ms. Davis reviewed the report and "signed off" on it on February 11, 2015. According to Mr. Frye, Mr. Omotoso also reviewed the report and "did not express any disagreement." (Mr. Omotoso could not recall doing that.)[20] By the end of February 2015, OTR mailed out its proposed assessments to taxpayers.

The new assessments troubled and aroused many affected Georgetown property owners. Joseph Sternlieb, President and CEO of the Georgetown Business Improvement District ("BID"), emailed Mr. Farr at OTR to say that his "phone ha[d] been ringing for . . . two weeks with complaints about the size of increases on some [TY2016] commercial tax assessments in the Georgetown BID area." He thought something had to be wrong. Mr. Sternlieb contacted not just Mr. Farr, but also Jack Evans, a D.C. Councilmember, and Jeffrey DeWitt, the District's Chief Financial Officer. He said in a contemporaneous email that his "strategy" was to have the

---

[20] Ms. Davis claims that any increase in assessed values of over ten percent had to be approved by Mr. Omotoso or Mr. Farr.

assessments "amend[ed] . . . without forcing everything through the appeals process" that individual taxpayers must typically go through to contest an assessment of their property.[21]

In response to the complaints from Georgetown, Mr. Farr reviewed Mr. Frye's proposed assessments. He did not dispute the desirability, in principle, of using the income method. Nor did Mr. Omotoso. Mr. Farr also asked Mr. Omotoso for explanations. Mr. Omotoso told him that "[f]or a long time Georgetown has been assessed on Cost Approach [*sic*]," but that "[t]his approach over time . . . will clearly not reflect market values of properties driven largely by income generating potentials," like some of the Georgetown properties. "While increase in value may indeed be warranted generally in Georgetown," Mr. Omotoso continued, "phased increase is (in my opinion) the right approach." Mr. Frye had not phased in the increased values. According to Ms. Davis, neither he nor she had the authority to do so.

Nonetheless, Mr. Farr ultimately concluded the proposed income-method assessments were seriously flawed because Mr. Frye "substantially overstat[ed]

---

[21] *See* D.C. Code § 47-825.01a(d), (e), (g).

square footage and market rents." As a result, according to Mr. Farr, Mr. Frye had "consistently and significantly over assessed property values by more than $143 [m]illion" in total. Ms. Davis and Mr. Frye contest this. Ms. Davis testified that, at most, only twenty percent of the square footages were overestimated, and it was a common mistake that could be corrected easily. Nonetheless, by April 20, OTR sent eighty-one "corrected" assessments to the Georgetown property owners. The "corrected" assessments were calculated using the income method (*not* the cost method), yet were, in total, $143 million less than Mr. Frye's valuations. Neither Ms. Davis nor Mr. Frye participated in creating these reassessments, and they dispute their accuracy.[22] Still, the reassessments spared many of the affected Georgetown taxpayers from going through the appeals process.

The next day, April 21, both Mr. Frye and Ms. Davis were fired. Mr. Farr had requested their terminations — Mr. Frye for "over assessing" the Georgetown properties by $143 million, and Ms. Davis for failing to appropriately supervise Mr. Frye and review his work. Unlike Mr. Frye, Ms. Davis was an at-will employee.

---

[22] Another assessor, Rafael Menkes, testified in deposition that (in his opinion) at least one of Mr. Farr's "corrected" assessments was "done completely incorrectly."

Later that year, Mr. Farr told the appraiser who took over Mr. Frye's Georgetown properties, Mr. Menkes, to start "trend[ing] them up" over the course of a few years, "because they were so grossly undervalued."

## C.

In April 2016, Ms. Davis filed suit in the Superior Court. She claimed that OTR violated the DCWPA by firing her for making a "protected disclosure" — namely, her report to her superiors that OTR's use of the cost method to value commercial retail and mixed-use properties in Georgetown "was wrong and costing the District millions in lost tax revenue."[23] After discovery closed, she moved for leave to amend her complaint to add a claim that she was fired in contravention of public policy for her refusal to violate the law.

Both claims were unsuccessful. The trial court granted summary judgment to the District on Ms. Davis's whistleblower claim, holding it failed as a matter of law

---

[23] *See* D.C. Code § 1-615.53(a) ("A supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure . . . ."); § 1-615.52(a)(5)(A) (defining a "prohibited personnel action" to include termination of employment); § 1-615.54(a) (provided that "[a]n employee aggrieved by a violation of § 1-615.53 may bring a civil action against the District . . . .").

because her criticism of the cost method did not amount to a "protected disclosure" within the meaning of the DCWPA. The court also denied Ms. Davis's motion for leave to amend her complaint, primarily on the ground that her wrongful discharge claim was futile, and secondarily because her assertion of that claim was untimely. Ms. Davis appeals both the court's rulings.

## II.

We review the grant of summary judgment *de novo*, applying the same standard used by the trial court.[24] To prevail under that standard, the District, as movant, "must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law."[25] Although that burden rests on the District, it nonetheless was entitled to summary judgment if it demonstrated that Ms. Davis "fail[ed] to make a sufficient showing on an essential element of her claim with respect to which she has the burden of proof."[26] The District argues that Ms.

---

[24] *Kolowski v. District of Columbia*, 244 A.3d 1008, 1012 (D.C. 2020) (quoting *Johnson v. Washington Gas Light Co.*, 109 A.3d 1118, 1120 (D.C. 2015)).

[25] *Id.* at 1012–13 (quoting *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C. 2001)).

[26] *Washington Gas Light Co.*, 109 A.3d at 1120.

Davis could not show that she made a protected disclosure — an essential element of her DCWPA claim, and one which she bore the burden of proving.[27] In evaluating this contention, we view the record in the light most favorable to Ms. Davis.[28]

In pertinent part, the DCWPA defines a "protected disclosure" as "any disclosure of information . . . made to any person by an employee . . . that the employee reasonably believes evidences" one or more of five enumerated circumstances — the ones claimed here being "[g]ross mismanagement" or "[g]ross misuse or waste of public resources or funds."[29] No reasonable jury, the District contends, could find that Ms. Davis's "recommendations to her supervisors about how OTR should approach assessments of commercial retail properties" indicated either gross mismanagement or a gross waste of public funds.

---

[27] *Ukwuani v. District of Columbia*, 241 A.3d 529, 551 (D.C. 2020) (stating the elements of a DCWPA claim).

[28] *Id.*

[29] D.C. Code § 1-615.52(a)(6), (a)(6)(A)–(B). Although not claimed here, the other enumerated circumstances are "[a]buse of authority in connection with the administration of a public program or the execution of a public contract"; "[a] violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature"; and "[a] substantial and specific danger to the public health and safety." D.C. Code § 1-615.52(a)(6)(C)–(E).

Whether the information Ms. Davis conveyed to her superiors was "protected" turns not on whether it *actually* evidenced "gross mismanagement" or "gross misuse or waste of public resources or funds," but on whether Ms. Davis *reasonably believed* that it did.[30] "This requirement is both subjective and objective."[31] It is not enough for Ms. Davis to have subjectively thought that using the cost method to assess commercial properties in Georgetown was gross mismanagement or gross misuse. No one doubts that she did think so. But she must also show that "a disinterested observer" with her "knowledge of the essential facts" could "reasonably conclude" that as well.[32] For the following reasons, we hold she has not made that showing.

## A.

We first consider whether a disinterested observer could reasonably believe Ms. Davis's disclosure evidenced "gross mismanagement." The term is not defined in the DCWPA. Our cases have emphasized that it refers only to maladministration

---

[30] *Zirkle*, 830 A.2d at 1260.

[31] *Johnson v. District of Columbia*, 225 A.3d 1269, 1276 (D.C. 2020).

[32] *Id.* (quoting *Zirkle*, 830 A.2d at 1259–60).

that is truly egregious and indisputable. Thus, we have said that "gross mismanagement" is "a management action or inaction that creates a substantial risk of significant adverse impact on the agency's ability to accomplish its mission."[33] Mere negligence is insufficient.[34] To be "gross," the mismanagement must be so "serious . . . that a conclusion the agency erred is not debatable among reasonable people."[35] Consequently, "[d]ebatable differences of opinion concerning policy matters are not protected disclosures."[36]

Ms. Davis claims that OTR's use of the cost method to value certain properties in Georgetown was "incorrect." She does not claim that OTR applied the cost methodology in an incorrect manner or with erroneous data.[37] Rather, the claim is that the cost approach cannot appropriately be applied to certain properties. The properties? A subset of the commercial retail and mixed-use properties in

---

[33] *Id.* at 1275–76 (quoting *District of Columbia v. Poindexter*, 104 A.3d 848, 855 (D.C. 2014)).

[34] *Poindexter*, 104 A.3d at 855.

[35] *Id.*

[36] *Id.*

[37] *Young Woman's Christian Ass'n of Nat'l Cap. Area, Inc. v. District of Columbia*, 731 A.2d 849, 851 (D.C. 1999).

Georgetown: those commercial retail and mixed-use properties in Georgetown *that are fully depreciated but still are producing significant income.*[38] Ms. Davis claims that using the cost approach to assess these properties caused OTR to significantly undervalue them. This, she contends, indisputably undermined OTR's "ability to accomplish its mission," as that mission includes assessing properties at their estimated market value and collecting, in her words, the "correct" amount of real property tax.[39]

A fundamental problem with Ms. Davis's claim is that she has not identified any authority saying the cost approach cannot appropriately be applied to properties that are fully depreciated but still producing significant income. Neither of the authorities she cites, the USPAP and IAAO's Standard on Mass Appraisal of Real Property, support that. The USPAP says nothing about when the cost approach is or

---

[38] It is unclear, however, whether Ms. Davis used this level of specificity in her disclosures. *See supra* note 19; *Johnson*, 225 A.3d at 1276 ("To determine if the employee subjectively held such a belief, we look to 'the statements in her complaint to a supervisor or to a public body, not her subsequent characterization of those statements in litigation.'" (quoting *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008))).

[39] D.C. Code §§ 47-820(a)(1), 47-821(b).

is not applicable.[40]  Meanwhile, the IAAO's Standard on Mass Appraisal of Real Property undermines Ms. Davis's position.  It says, for example, that "[t]he cost approach is applicable to *virtually all* improved parcels and, if used properly, can produce accurate valuations."[41]

We readily acknowledge that the IAAO also identifies the income approach as the "preferred valuation approach" for "income-producing properties" in general,[42] and as the "most appropriate method in valuing commercial and industrial property if sufficient income data are available."[43]  But showing that the income approach is "preferred" or "most appropriate" is not the same as saying the cost approach is "wrong."  Our decision in *Safeway Stores* is instructive on this point.  In that case, we observed that "Safeway may [have] be[en] correct that income capitalization is generally the best method for valuing income-producing business

---

[40]  *See generally* The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice (2014), http://www.appraisertom.com/USPAP-2014-15.pdf; https://perma.cc/8AM5-E6G5.

[41]  IAAO, *supra* note 12, at 9.

[42]  *Id.* at 10.

[43]  *Id.* at 11.

property," but we still held that using the cost method was not "incorrect."[44] Similarly, in *Bender v. District of Columbia*, we held that an assessment based on the cost approach was not "incorrect," even if appellant had shown that the sales comparison approach "was the preferred methodology."[45]

Ms. Davis's argument implicitly assumes there are "correct" valuations and a "correct" amount of taxes the District should collect. But a property's estimated market value is not a single, objectively "correct" number. It is only an imperfect prediction that is subject to all the uncertainties and vagaries of data and the market. Thus, we have recognized that "estimating market value is a rather subjective art."[46] It requires appraisers "to apply their best judgment to a number of indeterminate factors," including "market perceptions, opinions, and attitudes," all "to calculate a single market value figure."[47] For that reason, we have said that even a "gross

---

[44] *Safeway Stores, Inc. v. District of Columbia*, 525 A.2d 207, 211 (D.C. 1987).

[45] 804 A.2d 267, 268–69 (D.C. 2002).

[46] *Wash. Post Co. v. District of Columbia*, 596 A.2d 517, 522 (D.C. 1991) (quoting *District of Columbia v. Green*, 310 A.2d 848, 856 (D.C. 1973)).

[47] *Wolf v. District of Columbia*, 597 A.2d 1303, 1306 n.4 (D.C. 1991) ("*Wolf I*") (quoting American Institute of Real Estate Appraisers, The Appraisal of Real Estate 272, 504–05 (8th ed. 1983)).

disparity" between two appraisals is not enough to show that one is right and the other is wrong.[48]

In point of fact, moreover, unrebutted evidence presented to the trial court showed that valuations based on the income approach often were not much higher or more accurate predictors than the cost-approach valuations. Take, for example, the two "Georgetown Park" properties, which comprised a shopping complex and an unimproved abutting lot. These are the properties on which Ms. Davis relies most heavily (almost exclusively, in fact) in her briefing. In 2014, those combined properties sold for a total price of $220 million. According to Mr. Frye's computations, both the cost methodology and the income methodology led to quite similar estimates of the market value of those combined properties, and both those estimates were substantially below the actual sale price: the cost method yielded a valuation of $121.3 million, while the income method generated a valuation of $126.9 million. Thus, either method missed the sale price by about $93-99 million. This hardly shows that it was gross mismanagement to use the cost method rather than the income method; and it may well indicate not only the difficulty of predicting

---

[48] *See Young Woman's Christian Ass'n*, 731 A.2d at 850–51.

market value, but that the Georgetown Park sale was an outlier or anomalous in some way.

The handful of other Georgetown properties to which Ms. Davis pointed also fail to show it was gross mismanagement for OTR to rely on the cost method instead of the income method. First, the properties at 3241 M Street N.W. and 3245 M Street N.W.; they sold together in 2016 for $18,480,000. The cost-approach valuation for the combined properties on January 1, 2015, was $6,386,780. Mr. Frye's proposed valuation using the income approach was $8,735,430 — about $2 million more than the cost-approach valuation, but still about $10 million short of the sales price. Second, the property at 3150 M Street N.W. sold in 2014 for $12,250,000. The cost method yielded an estimated market value of $4,378,430. In this instance, Mr. Frye's income-approach valuation, $9,595,160, was materially higher and closer to the actual sales price (though still off by $2.65 million, or over 20%). Thus, of the three properties Ms. Davis points us to (i.e., these two and Georgetown Park), only one of the three — 3150 M Street N.W. — shows the income approach doing materially better at approximating the sales price than the cost approach. Ms. Davis did not point the trial court (and has not pointed us) to any other particular properties in this context.

Ms. Davis asserts that Georgetown properties generally had been selling "for millions more than their assessed values" under the cost approach, and that this disparity "confirmed" that OTR had been valuing the properties "incorrectly." For support, she cites the deposition testimony of another OTR appraiser (Gregory Rogers, who was assigned to the "appeals and litigation team"). He stated that the disparity between assessments and sales (i.e., the "assessment to sales ratio") of Georgetown commercial properties "wasn't very good . . . until [OTR] changed the methodology" to the income approach. This is some support for the proposition that, generally speaking at least, the income approach had been found to approximate sales prices better than the cost approach had done. But the support is insufficient. A claim of egregious and indisputable mismanagement must rest on something stronger than a single, conclusory line of deposition testimony that the cost approach "wasn't very good." And Ms. Davis's reference to an unquantified "millions" fails to indicate the magnitude of the issue.

This is the same reason Ms. Davis's reliance on Mr. Omotoso's opinion is unavailing. Mr. Omotoso said the cost method "over time . . . will clearly not reflect market values of properties driven largely by income generating potentials." This, like Ms. Davis's allegation of undervaluing properties by "millions," is unquantified. Consequently, even if it indicates that the cost approach was generally undervaluing

properties, it does not indicate the magnitude of that issue. After all, whether a problem amounts to gross mismanagement, rather than simple mismanagement — if mismanagement at all — is a question of degree. By how much did cost-approach valuations fall short of market values? How much of an impact on tax collections did those shortfalls actually have? We do not know, and Ms. Davis does not answer it with a mere allegation that they fell short by an abstract "millions."[49]

We also find it significant that the District was already working to remedy the problem. It appears from the evidentiary materials the District submitted in support of summary judgment that OTR was developing a computer model to use the income approach consistently and reliably for commercial retail and mixed-use properties. Mr. Frye himself was working on building such a model in early 2015. Although the District never explicitly argued (in Superior Court) that OTR was waiting to be able to deploy such a model, its evidence showed it would have been difficult and risky to employ the income methodology without one. According to a Report by the Office of the Inspector General, "[t]he sheer challenge of manually applying the

---

[49] *Ukwuani*, 241 A.3d at 541–42 ("Allegations that are unsupported or conclusory are 'insufficient to establish a genuine issue of material fact to defeat the entry of summary judgment.'" (quoting *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198 (D.C. 1991)).

income approach individually to hundreds of properties every year is a daunting, time-consuming task."[50] And when appraisers do not use the same model, "[t]he potential for under-valuing or over-valuing is more likely to occur."[51] Thus, evidence proffered by the District indicates that OTR may have had good reason to hold off switching from the cost to the income approach to valuation. Significantly for us, the District's showing on this point (and argument in its brief on appeal) is unrebutted, as Ms. Davis has not responded to it.

In sum, Ms. Davis may succeed in showing that the income approach was preferable to the cost approach for the specified properties, but she did not show the cost approach was "wrong." We therefore hold that a disinterested observer, apprised of the information Ms. Davis disclosed, could not reasonably have concluded that using the cost method instead of the income method to assess commercial properties in Georgetown amounted to gross mismanagement.

---

[50] Office of the Inspector General, Evaluation of the District's Management and Valuation of Commercial Real Property Assessments 7 (2012), http://app.oig.dc.gov/news/PDF/release10/OIG%20No.%2013-2-01AT%20BRPAA%20Final%20Report.pdf; https://perma.cc/PBW3-GGQJ.

[51] *Id.*

**B.**

We next address whether a disinterested observer could reasonably conclude Ms. Davis disclosed evidence of a "gross misuse or waste of public resources or funds." A "gross . . . waste of public resources or funds" is "a more than debatable expenditure that is significantly out of proportion to the benefit reasonably expected to accrue to the government."[52] Ms. Davis charges that OTR's use of the cost method grossly wasted public funds by "costing the District millions in lost tax revenue." In response, the District argues that yet-to-be-collected tax revenue is not a public resource or fund, because it is not in the District's coffers.

We agree with the District. The paradigmatic case of waste is one in which the government spends money recklessly.[53] It is grounded in an "expenditure." What Ms. Davis alleges, however, is not an "expenditure." Instead, she contends the District was not *collecting* as much money as it could have. This sounds more in mismanagement than in waste. Even on its own terms, though, the allegation

---

[52] *Poindexter*, 104 A.3d at 857.

[53] *See, e.g.*, *Williams v. Johnson*, 776 F.3d 865, 871 (D.C. Cir. 2015) (employee disclosed that government's "expenditures on [a computer program] were significant," but the program was "useless" and the government was "just burning money").

fails, because the District did not fail to collect "*public* resources or funds." Uncollected taxes — money still in the taxpayers' pockets — are not public funds that the District can waste or misuse.

We therefore affirm the trial court's grant of the District's summary judgment motion.

## III.

Last, we review the trial court's denial of Ms. Davis's motion for leave to file an amended complaint. Alleging she was fired "because she refused to violate the law," Ms. Davis sought to add a common law claim for wrongful discharge in violation of public policy.[54] This cause of action is a "very narrow" exception to "the general rule that at-will employees may be discharged at any time for any reason."[55] The exception applies, as we held in *Adams v. George W. Cochran &*

---

[54] Ms. Davis could have based a statutory whistleblower claim on the same allegation but did not do so. *See* D.C. Code § 1-615.53(a) (prohibiting retaliating "against an employee because of . . . an employee's refusal to comply with an illegal order").

[55] *Davis v. Cmty. Alts. of Wash. D.C., Inc.*, 74 A.3d 707, 709 (D.C. 2013) (quoting *Carl v. Children's Hosp.*, 702 A.2d 159, 159–60 (D.C. 1997) (en banc)).

*Co., Inc.*, when "the sole reason for the discharge is the employee's refusal to violate the law."[56]

Ms. Davis allegedly refused to violate D.C. Code §§ 47-820(a) and 47-821(b). D.C. Code § 47-820(a)(3) states that "[t]he assessed value for all real property shall be the estimated market value of such property as of the valuation date, as determined by the Mayor." D.C. Code § 47-821(b) states that "[t]he Mayor shall appoint assessors competent to determine values of real property to carry out the provisions of §§ 47-820 to 47-828 and other relevant portions of this chapter" (emphasis added). Ms. Davis understands these provisions to require OTR assessors to appraise real property at its estimated market value.

The trial court denied Ms. Davis's motion for leave to amend on several grounds, but said the "decisive factor" was that her claim was futile. According to the trial court, Ms. Davis could not have violated either cited provision, because they

---

[56] 597 A.2d 28, 34 (D.C. 1991). The public policy exception sometimes may be invoked when the employer has other reasons for discharging the employee. *See Carl*, 702 A.2d at 160. Ms. Davis does not claim any of those other situations is before us in this case, however.

impose duties only on the Mayor. The court reasoned that "the only person who could conceivably 'violate' either statute is the Mayor."

Reviewing the denial of leave to amend for abuse of discretion,[57] we perceive that the trial court based its ruling on an erroneous view of the statutes. Our case law recognizes that § 47-820(a), at least, imposes an obligation on OTR appraisers.[58] Nonetheless, the trial court reasonably could not have ruled otherwise, because a necessary predicate for Ms. Davis's *Adams* claim is missing. To make out a plausible *Adams* claim, an employee must show there was "an outright refusal to violate a specific law, with the employer putting the employee to the choice of breaking the law or losing [her] job."[59] Ms. Davis concedes that OTR never put her to such a choice; it never directed her to break the law, nor did she ever refuse to do so. As our discussion above implies, even if OTR had ordered Ms. Davis to "use

---

[57] *Sibley v. St. Albans School*, 134 A.3d 789, 797 (D.C. 2016).

[58] *See Young Women's Christian Ass'n*, 731 A.3d at 852 (a taxpayer challenging the District's assessment must demonstrate "that *the assessor* failed to fulfill the statutory requirements of . . . D.C. Code § 47-820(a)" (emphasis added)); *Safeway Stores, Inc.*, 525 A.2d at 212 (an appraiser for the District "did not fulfill *his obligation* under § 47-820(a) to consider income earning potential" (emphasis added)).

[59] *Mandsager v. Jaquith*, 706 A.2d 39, 42 (D.C. 1998) (quoting *Thigpen v. Greenpeace, Inc.*, 657 A.2d 770, 771 (D.C. 1995)).

the cost method," that order would not have directed her to violate the law.[60]
Therefore, we affirm the denial of Ms. Davis's motion for leave to amend.

## IV.

In sum, we hold that Ms. Davis failed to present sufficient evidence from which a reasonable jury could find that she made a protected disclosure of either gross mismanagement or gross waste of public funds. The trial court therefore did not err in granting the District's summary judgment motion. We also hold that her claim of discharge in violation of public policy was futile, as she was not directed to violate the law and she did not refuse to do so. The trial court therefore did not err in denying her leave to file an amended complaint.

*Affirmed.*

---

[60] *Id.* at 42 ("[I]t is not enough to show that the employee might infer from the employer's conduct that she was being asked to do something that was *possibly* illegal." (emphasis added)). Hence Ms. Davis would not have stated a public policy exception to the at-will employment doctrine merely by alleging that she was fired for not using the cost method.